Filed 4/13/15  P. v. Norris CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER ALLEN NORRIS,<br><br>    Defendant and Appellant. | F067718<br><br>(Super. Ct. No. MCR038511)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Christopher Allen Norris of the murder of Alonzo Herrera. (Pen. Code, § 187, subd. (a).)[1] The jury also found true several enhancements, as well as the special circumstance allegation that the murder was committed while Norris was an active member of a criminal street gang.

Norris argues the trial court erred in admitting a portion of the testimony of Jacob Sosa, one of the prosecution's primary witnesses. We affirm the judgment, concluding that even if the trial court erred, any possible prejudice Norris suffered as a result of this testimony was not sufficient to warrant reversal.

## FACTUAL AND PROCEDURAL SUMMARY

### The Evidence Produced at Trial

The only issue in the case was the identity of the individual who shot the victim. The victim died of multiple gunshot wounds that caused catastrophic damage to the brain stem, heart, and lungs. The prosecution relied primarily on two witnesses, Sara Hilton and Sosa, to establish the identity of the perpetrator.

Hilton met Norris at a friend's house weeks before the shooting. The two were intimate for a few weeks but by the day of the shooting they were only friends. Hilton knew Norris was involved in gangs, but she did not get involved in that aspect of his life.

Hilton admitted to a 20-year history of polysubstance abuse. She began using drugs when she was seven years old. On the day of the shooting, Hilton's drug abuse began about 7:00 a.m. and included methamphetamine, Norco, Vicodin, Soma, Percocet, alcohol, and marijuana. She used methamphetamine several times that day and consumed a lot of alcohol. The combination of drugs and alcohol made her feel numb. The methamphetamine helped calm her nerves and allowed her to function better than when she was sober. In an attempt to improve her life, Hilton remained sober for the three months before she testified.

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

Hilton spent the day of the shooting with Justin Riley. In the evening Riley and Hilton encountered Robert Lowe on the side of Riley's house. Hilton was going to borrow Riley's vehicle to run an errand when Lowe approached the vehicle. Lowe was speaking with Riley and then he came over to Hilton. It looked to Hilton as if Lowe was trying to bully or intimidate Riley. Lowe would not let Hilton leave the vehicle. Lowe was trying to tell Hilton about his discussion with Riley, but Hilton was ignoring him. Lowe would not leave when Hilton asked him to do so, so she sent a text message to her cousin and to Norris. Hilton told Norris she wanted a ride to get away from Lowe.

Lowe eventually let Hilton leave, so Hilton drove around the corner and picked up Riley. Hilton drove to a friend's house and Riley then drove away, leaving Hilton at her friend's house. A short while later Riley texted Hilton and asked her to come back, so Hilton walked back to Riley's house.

Riley was standing at his vehicle when Hilton arrived. Norris arrived with a group of men, but only he and one other man approached Hilton and Riley. The other man with Norris was fairly young, had dark skin, and could have been Black or Hispanic. Hilton remembered seeing a red shirt, but could not recall if someone was wearing it or only carrying it.

Norris did not say anything to Hilton. Someone asked if that was the individual causing problems, and Riley said it was. Norris and the other male left, but Hilton did not watch them walk away. Hilton heard a gunshot a short while later. She turned around and saw the victim, a Hispanic male, fall to the ground in a vacant lot near where she was standing. She also saw Norris fire another shot at the victim. Hilton heard a total of four to five gunshots. She fled the area with Riley. Later, Hilton sent a text message to Norris asking what had happened. Norris, or someone using his phone, replied, "I did what I had to do," or words to that effect.

Hilton admitted she had poor eyesight and could not see objects far away. She had a prescription for glasses but was not wearing them on the day of the shooting. In

3.

addition, she stated several times during her testimony that her memory and perception of the events was clouded because of her drug and alcohol intake. Hilton also admitted that when she was first interviewed by police officers she "lied a lot." She was "being very difficult," but eventually identified Norris as the individual who shot the victim.

Riley testified about the events leading up to the shooting in a manner similar to Hilton's testimony. He admitted to ingesting alcohol and methamphetamine throughout the day. He explained his feud with Lowe and his initial refusal to fight Lowe on the day of the shooting. At that point he and Hilton left the area in Riley's vehicle. Riley drove back to his house with the intent of fighting Lowe to end the dispute. He called out to Lowe from the vacant lot, but Lowe did not exit his house. Riley then observed Norris and three Hispanic males arrive. Riley told Norris this was his fight. Norris told Riley to go home. Riley was walking towards Hilton when he heard gunshots. He turned around and saw the four men surrounding the victim, who was on his knees. Riley did not see a firearm, nor could he tell who was firing the firearm, but he heard and saw more shots. Riley and Hilton then fled the scene.

Lowe and his mother both testified. Lowe's testimony was, at best, evasive, but he eventually admitted seeing four men approach the victim but did not identify anyone. Similarly, Lowe's mother was not able to identify who shot the victim. The remainder of the testimony of both witnesses is not relevant to any issue here.

Sosa testified he had at least two conversations with Norris after the murder. Both conversations took place at the house of Rudiver Garcia, a friend of Sosa's, where Sosa went to buy and smoke medical marijuana. Garcia was involved in the NSM criminal street gang, which is a Norteño gang. Sosa first met Norris at Garcia's house. Sosa smoked marijuana before and/or during both of his conversations with Norris.

In the first conversation, Norris admitted he shot someone who he thought was Lowe, but later learned was not. Norris said he shot the victim and then emptied the clip

4.

into him after the victim fell to the ground.  Norris also said he was staying in Firebaugh to hide from the police.

In the second conversation, Norris performed a reenactment of the shooting. Norris said he went up to the victim and said, "What's up," and then started shooting. Norris said he sold the firearm in San Jose.  Norris said, "It wasn't the first or the last time."  Sosa interpreted the comment to mean that Norris had "done it before and it wasn't his last."  Norris went on to state that he had no morals.

The second conversation "bothered" Sosa "all night."  After talking to several people about what he should do, Sosa contacted the police.  Sosa was not aware of a reward related to the murder.

Madera Police Detective Jason Dilbeck testified as the prosecution's expert on criminal street gangs.  He testified to the general background of the Norteño criminal street gang and identified the Vario North Side Madera (VNSM) as a Norteño gang and as the most violent criminal street gang in Madera County.  Dilbeck opined that on the day of the shooting Norris was an active member of the VNSM gang.  Dilbeck based his opinion on numerous factors, including Norris's numerous gang tattoos, as well as on several admissions of gang membership.

Dilbeck also opined the crime was gang related for several reasons.  One reason was that one of the four men who arrived was wearing a red shirt and another had a red bandana.  The color red is associated with the Norteño criminal street gang.  Dilbeck also observed that Norris admitted to Sosa he approached the victim and said, "What's up," which is a challenge among gang members.  Norris also bragged to Sosa and others he committed the murder and then bragged he had committed other murders.  Norris was still associating with Norteños after the murder, which led Dilbeck to believe Norris remained in good standing with the Norteños.  Moreover, incidents within the jail suggested Norris remained in good standing with the Norteño gang.

5.

Finally, Dilbeck opined, based on the facts of an exhaustive hypothetical, that Norris committed this murder for the benefit of the Norteño criminal street gang. His opinion was based on several facts, beginning with Lowe being a Norteño dropout and a noticeable presence in the community because of his behavior. As a dropout he would have been looked upon with disfavor by the gang, and his habit of drawing attention to himself would be seen as a sign of disrespect by the gang. Disrespect invariably would lead to retaliation by the gang. That Norris also bragged about the crime to others enhanced the reputation of the gang for violence. Dilbeck opined that Norris challenged the victim when he confronted him by stating, "What's up." At that point, there was nothing the victim could do to defuse the situation. Dilbeck also based his opinion on his knowledge of Norris and his past behavior.

### The Information

The second amended information contained a single count charging Norris with first degree murder. (§ 187, subd. (a).) In addition, this count alleged (1) the special circumstance allegation that Norris was an active member of a criminal street gang at the time of the murder (§ 190.2, subd. (a)(22)), (2) Norris intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d), (3) the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), (4) Norris sustained a prior serious felony conviction (§ 667, subd. (a)(1)), (5) Norris sustained a prior conviction that constituted a strike (§ 667, subds. (b)-(i)), and (6) Norris served two prior prison terms (§ 667.5, subd. (b)). The district attorney did not seek the death penalty.

### Verdict and Sentencing

The jury convicted Norris of first degree murder and found the special circumstance allegation and all enhancements true. The trial court sentenced Norris to the prescribed term of life without the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d), plus a determinate term of five years pursuant to section 667, subdivision (a)(1).

## DISCUSSION

### *Contested Testimony*

During direct examination, Sosa testified he went to Firebaugh to buy and smoke medical marijuana with his friends. On two occasions, Norris was at his friend's residence when Sosa arrived. During the first occasion, Norris admitted shooting the victim because he thought the victim was Lowe. On the second occasion, Norris reenacted the crime for the group. At this point the prosecutor asked Sosa if Norris said anything and the following colloquy occurred:

"A 'It wasn't the first or the last time.'

"Q Did he tell you what he meant by that?

"A No.

"Q And what did you take that to mean?

"[DEFENSE COUNSEL]: Objection. Speculation.

"THE COURT: Sustained. [¶]

"Q Can you tell us the context in which he said, 'it wasn't the first or the last time'?

"A What do you mean?

"Q Who's first?

"A He was just pretty much saying that he'd done it before and it wasn't his last.

"[DEFENSE COUNSEL]: Objection. Speculation. Motion to strike.

"THE COURT: Overruled. [¶]

"Q That he had done what before?

"A Murder.

"Q And that it wasn't his last?

7.

"A  Yes, sir."

Norris first claims the trial court erred in overruling his objection to Sosa's interpretation of the statement, "It wasn't the first or the last time."  Second, Norris argues defense counsel was ineffective because he failed to object to the testimony as improper character evidence (Evid. Code, § 1101), and because the probative value of the evidence was substantially outweighed by its prejudicial effect (*id.*, § 352).

***Standard of Review***

We review evidentiary rulings for an abuse of discretion.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)  "A trial court's exercise of discretion in admitting or excluding evidence … will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner .…" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10, citation omitted.)  Or, stated another way, a trial court abuses its discretion when it appears that its decision exceeds the bounds of reason when all of the circumstances are considered.  (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)

Any error in evidentiary rulings will require reversal only if the error resulted in a miscarriage of justice.  (Cal. Const., art. VI, § 13.)  A miscarriage of justice occurs where it appears reasonably probable that the defendant would have achieved a more favorable result had the error not occurred.  (*People v. Breverman* (1998) 19 Cal.4th 142, 149.)

***Analysis***

Norris maintains that defense counsel's objection was broad enough to encompass an objection based on improper lay opinion testimony.  If so, then his claim of ineffective assistance of counsel is moot.  If not, then his claim is valid.

It appears to us that whichever objection we consider, this portion of Sosa's testimony should have been excluded.  The most logical interpretation of Norris's statement is that he had murdered someone before, and he would murder someone in the future.  Once Sosa attempted to interpret Norris's thought process, however, he was

8.

speculating.  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)  Moreover, Sosa's interpretation of Norris's meaning had no probative value on any issue in the case, other than possibly an impermissible inference that because Norris had murdered someone in the past, he likely was guilty of this murder.  (Evid. Code, §§ 352, 1101, subd. (a).)  Finally, it also appears Sosa's interpretation of the statement indeed was a lay opinion, but it was not helpful to an understanding of Sosa's testimony, since the words spoken by Norris easily were understood by the jury.  (*Id.,* § 800, subd. (b).)

Nonetheless, we need not decide whether the trial court erred in overruling defense counsel's objection or whether defense counsel was ineffective for failing to object on other grounds because, even if we were to assume error occurred, Norris cannot establish prejudice sufficient to require reversal of the judgment.

Norris argues prejudice occurred because Sosa's testimony was "'so extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues.'  [Citation.]"  Indeed, Norris argues the evidence was so prejudicial that he was deprived of his due process right to a fair trial, thus requiring reversal unless we find beyond a reasonable doubt the error had no effect on the verdict.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

To support his claim, Norris points out that the only witness who identified him as the person who shot the victim was Hilton, whose credibility was highly suspect because of her alcohol and drug abuse, her poor reputation for veracity, and her poor eyesight.  Norris also observes that the other people in the vicinity who testified (Riley, Lowe, and Lowe's mother) could not, or would not, identify who shot the victim, suggesting Hilton could not see who fired the fatal shots.

According to Norris, because of the unreliable eyewitness testimony, Sosa's testimony was essential to the prosecution's case.  Norris also argues Sosa's testimony was suspect because (1) common sense suggests Norris would not confess to a stranger,

9.

(2) Sosa received a reward of $500 for his testimony, (3) Sosa admitted looking up the murder on the Internet where he could have learned the details of the crime that he then repeated to the police, and (4) Sosa's credibility was impugned because he was arrested for shoplifting shortly before he testified. Since, in Norris's view, there was a complete lack of reliable testimony, Sosa's interpretation of Norris's statement was the key piece of evidence that swayed the jury.

We disagree with Norris's view of the evidence. While it is true Hilton admitted to her drug and alcohol abuse, it also is true that Norris and Hilton were not strangers—Hilton admitted an intimate relationship with Norris. Thus, Hilton's familiarity with Norris militates against mistaken identity. Hilton also testified that Norris came up to her just before the shooting, so there is not any doubt about his presence.

Norris also ignores the incriminating text message he sent to Hilton after the shooting, which stated he "did what [he] had to do." It is true the text message could have been sent by someone using Norris's phone, but the jury was justified in inferring the text message was from Norris, especially since there was no evidence anyone used Norris's phone besides Norris. This inference also is supported by Hilton's starting the events in motion by sending a text message to Norris on his phone. It seems very unlikely anyone other than Norris sent the text message to Hilton.

We also observe that most of Hilton's testimony was corroborated by the other witnesses, suggesting her recollection of the events was accurate. Lowe essentially admitted his involvement in the events leading up to the shooting. [2] Riley also confirmed essential portions of Hilton's testimony, including Norris's arrival at the scene of the shooting with three other males, and that Norris was one of the four men around the victim after the gunshots began. If Hilton's memory of the events was accurate in these

---

[2]We recognize Lowe was a very difficult witness, but a fair reading of his testimony, along with reasonable inferences, suggests he acknowledged his involvement in these events.

other respects, it is likely it was accurate in her identification of Norris as the person who shot the victim.

We also are not convinced by the failure of other witnesses to identify Norris as the shooter. The testimony was undisputed that Norris was a gang member and that several witnesses received threats about the consequences of testifying in this case. It also appeared Lowe was, at a minimum, associated with the Norteños at one time. The undisputed testimony established that fatal retaliation could result if one gang member testified against other gang members. Lowe's inability to identify the individual who shot the victim may well be the result of his association with the Norteños, or his knowledge of the consequences of testifying against a gang member.

We also note that neither Sosa nor Hilton had any motivation to fabricate his or her testimony against Norris. Other than the one $500 reward payment received by Sosa (Sosa testified he did not know about a reward when he first contacted police about his conversations with Norris), the only "reward" Sosa or Hilton received for his or her testimony was the need to move out of Madera because of the perceived danger he or she would be in if he or she did not do so. While Hilton did receive some relocation assistance, Sosa did not. There was no evidence of any interaction between Sosa and Norris that could motivate Sosa to fabricate evidence against Norris. Sosa stated he had never talked with Norris before their meeting at a mutual friend's house after the shooting. Moreover, Hilton made it clear she did not want to testify against Norris, and doing so was difficult for her. Quite simply, nothing in the record supports the theory that Hilton's and Sosa's testimony was motivated by financial gain or because of some type of animus against Norris.

Another compelling reason to reject Norris's argument of prejudice is that the most damaging portion of Sosa's testimony was not Sosa's interpretation of Norris's remarks. Indeed, Sosa's comments added little to the proceedings because the context in which Norris made his statement left little doubt about its meaning. Sosa explained

11.

Norris made the comment after he reenacted the murder for the assembled group. In other words, Norris demonstrated to the group how he murdered the victim, and then said he did it before and would do it again. It is inconceivable the comment would have been interpreted by the jury in any fashion other than the same fashion as it was interpreted by Sosa.

More importantly, the most incriminating portion of Sosa's testimony was Norris's admission, on two occasions, that he murdered the victim. If the jury was inclined to reject Sosa's testimony because it felt the testimony was fabricated, it also would have rejected the portion of Sosa's testimony about this statement. In other words, the jury undoubtedly either accepted or rejected the entire testimony. Sosa's testimony did not become more believable simply because it contained a statement from Norris that he did it before and he would do it again. Norris's admission that he murdered the victim in cold blood, and his failure to show any remorse for murdering the wrong person, is far more incriminating than the braggadocio associated with a claim that Norris had killed in the past and would kill again. Indeed, Norris's demonstration to the assembled group of how he had pointed the gun at the defenseless victim and kept pulling the trigger until there were no more bullets in the gun renders the suggestion that Norris had killed in the past superfluous.

We also reject Norris's suggestion that common sense dictates he would not confess to a stranger. First, he was not just in the presence of a stranger, but he also was in the presence of friends and fellow gang members. Second, the expert testimony established that gang members frequently brag about their crimes because if no one knows you have committed a crime, you cannot enhance your reputation as a gang member of whom all should be afraid. The circumstances surrounding Norris's admission strongly suggest he was bragging to fellow gang members and felt safe in Sosa's presence because Sosa also was friends with these gang members.

And we do not find persuasive the claims that Sosa was not believable because he was arrested for shoplifting shortly before he testified and because he looked up the crime on the Internet. The first item certainly was one the jury was entitled to consider, but was hardly so damaging as to destroy Sosa's credibility. The second item was explained adequately by Sosa. After Norris confessed twice to murdering the victim, Sosa explained he decided to report the admissions to the police. To find out whom he should call, Sosa went on the Internet to locate information about the crime. Sosa confirmed that the facts of the crime he found on the Internet were consistent with Norris's confession. This explanation is logical and does not suggest Sosa was not credible. Moreover, it is unlikely anything Sosa found on the Internet would include Norris's admission that he kept firing until his firearm ran out of bullets.

### Conclusion

While the trial court may have erred in refusing to strike Sosa's interpretation of Norris's comment from the record, we conclude Norris cannot establish any prejudice as a result of this possible error. The lack of prejudice renders Norris's ineffective assistance of counsel arguments moot. Accordingly, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.

_____
CORNELL, Acting P.J.

WE CONCUR:


_____
FRANSON, J.


_____
PEÑA, J.

13.